*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EM,

        Petitioner-Appellee,

UNPUBLISHED
August 29, 2024

v

BD,

        Respondent-Appellant.

No. 369654
Ingham Circuit Court
LC No. 22-001699-PJ

Before: REDFORD, P.J., and GADOLA, C.J., and RIORDAN, J.

PER CURIAM.

Respondent, BD, appeals by right the trial court's 2024 order extending a personal protection order (PPO) in favor of petitioner, EM, following an evidentiary hearing on BD's motion to terminate the PPO that had been in place since 2022. The PPO was originally entered on the basis of EM's allegations that BD had sexually assaulted her during class while in middle school. In part, the PPO prohibited BD from interfering with EM at school and from engaging in conduct that impaired her educational relationship and environment. Although no criminal charges were ever pursued, BD was expelled from school for a year after a Title IX investigation. The local school district subsequently allowed BD to return to the classroom, resulting in EM and BD attending the same high school. Despite the school district's implementation of a safety plan that prohibited BD from making contact with EM, there were regular instances in which BD and EM saw each other in the high school's hallways. The trial court concluded that BD likely violated the PPO every time that he came into EM's view, but the court had not been presented with any show-cause or contempt filings. The trial court determined that there was reasonable cause to continue the PPO as long as BD insisted on attending the same high school as EM. The trial court reasoned that because of the extreme anxiety and migraines suffered by EM upon seeing BD, as supported by her testimony, BD's mere presence at the high school constituted conduct impairing EM's educational environment when the evidence demonstrated that she and BD regularly crossed paths. We affirm.

# I. BACKGROUND

On June 23, 2022, under the authority of MCL 600.2950a and through her mother, KM, as next friend, 14-year-old EM filed a petition for a PPO (nondomestic sexual assault) against 13-year-old BD.[1]  With respect to her need for a PPO, EM checked the box on the petition that provided, "I have a reasonable apprehension of sexual assault because the respondent has sexually assaulted me or threatened me with sexual assault."  EM asked the court to grant a PPO prohibiting or enjoining BD from engaging in a litany of actions, including, in pertinent part, from entering onto the property of the school that the parties attended.  Attached to and in support of the PPO petition, plaintiff included a Title IX investigation report prepared by Investigator Craig Kueffner.[2]  Investigator Kueffner interviewed EM on May 27, 2022.  The investigation report presented EM's description of two events involving BD that occurred at Mason Middle School:

> On Thursday, May 12, 2022, I was sitting in my 4th hour English class at a table with two chairs on one side with respondent next to me. he pulled my chair closer to him while straddling the side of my chair. He leaned forward as if he was going to tell me a secret. he put his hand inside of my baggy sweatpants and underwear. The respondent fingered me for a second. There was penetration; his finger was fully inside me. I tried to tell him to stop, but all he said was, "Boyfriend's name . . . can't find out about this!" I even tried to tell him that I was on my period. (I was not on my period, but I thought that it would stop him.)[.] I tried to move his arm away, but I couldn't. Then the bell rang, he took his hand out real fast, and I rushed out of the classroom.
>
> On Monday, May 16, 2022, the respondent sat next to me again in a different class (Robotics, 3rd hour). I was sitting near another boy in class. The respondent pulled up a chair. The respondent tried to do it to me again and rubbed my upper/inner thigh on the outside of my pants. I just got up and moved away to another friend in the class. The respondent did not say anything in this instance. [Original all in italics.]

EM informed Investigator Kueffner that there were no witnesses to the incidents, nor was anyone else aware of what transpired at the time of the assaults.  EM did indicate that on May 18, 2022, she told her boyfriend and a female student friend about the sexual assaults and that they insisted that she disclose the assaults to the school office.  According to EM, on May 19, 2022, EM, accompanied by her boyfriend and the female friend, went to the assistant principal's office where she revealed to the assistant principal and to EM's counselor that BD assaulted her as described above.

---

[1] On June 23, 2022, a request for next friend was filed, and on June 24, 2022, the trial court entered an order appointing EM's mother, KM, as her next friend.

[2] "There is no dispute that student-on-student sexual assault can constitute sexual harassment for Title IX purposes." *John Doe v Derby Bd of Ed*, 451 F Supp 2d 438, 444 (D Conn, 2006).

EM further informed Investigator Kueffner that prior to the two incidents at issue, BD would often try to "get closer" to her and act oddly, although there were no earlier sexual assaults. On those previous occasions, EM would simply move away from BD and ignore him. EM acknowledged that she and BD "dated for a week in 6th grade." EM described the two as "just acquaintances, kind-of friends."

Investigator Kueffner attempted to interview BD on May 30, 2022, regarding the allegations, but BD declined to participate on advice of legal counsel. The investigation report next set forth Assistant Principal (AP) Mary Hilker's summary of the incidents as described to her by EM on May 19, 2022. The summary was mostly consistent with and paralleled EM's recitation of events as described to Investigator Kueffner. AP Hilker indicated that EM informed her that EM told BD to stop when the first assault occurred and that EM asked BD what he was doing. AP Hilker also conveyed that she spoke to EM's female friend on May 19, 2022, and that the friend communicated that although she did not observe any sexual assault, she had previously seen BD messing with EM's legs and getting close and touchy. AP Hilker also observed that EM had sent a Snapchat message to the female friend about the incidents involving BD and that the friend showed AP Hilker the Snapchat exchange.

On June 1, 2022, Investigator Kueffner interviewed EM's female student friend who stated that EM texted her on Snapchat about BD touching her during English class, that the friend had not witnessed the assault, and that she had seen BD touching EM's legs and thighs in the past and tying and untying her shoelaces. The female friend also informed Investigator Kueffner that she and EM were close friends, that she, EM, and BD were all friends who walked to class together, and that the female friend stopped interacting with BD after learning about the assaults.[3]

On June 1, 2022, Investigator Kueffner interviewed the robotics teacher, Robert McKay, but McKay had not seen any physical contact between the parties. McKay noted that EM was often late for class, that he was unaware of any friendship or connection between EM and BD, and that the parties' assigned seats were not close to each other. On June 1, 2022, Investigator Kueffner also interviewed the English teacher, Mrs. McCormick. McCormick stated that EM and BD sat together in English class, that she had seen the parties talking together on occasion, and that "[s]he did not witness any interaction between the two students on" the day of the incident in English class.

Also attached to the PPO petition was the following handwritten statement made and signed by EM:

> When I see him [BD] it makes me think of what happened and you never know if it could happen again. I just want to be able to go places & not be worried about seeing him in public or at school.

---

[3] EM's female friend indicated that she and two male friends had accompanied EM to AP Hilker's office at which time the assaults were revealed; however, the male friends were not in the room when EM told AP Hilker and EM's counselor about the incidents.

On June 24, 2022, which was the day after the PPO petition was filed, the trial court entered an ex parte PPO against BD. But on June 27, 2022, an order was entered setting aside the PPO because a PH case code had been used in error instead of a PJ case code, which would properly encompass a PPO situation in which there is a nondomestic relationship involving minors. The order indicated that a new PPO would be entered employing the correct case code. On June 29, 2022, the trial judge who entered the miscoded PPO recused herself to avoid the appearance of impropriety, and a new judge was assigned the case.[4]

On July 1, 2022, a new ex parte PPO was entered against BD. The court found that BD posed a credible threat to EM's physical safety. The PPO prohibited BD from: entering onto property where EM lived; assaulting, attacking, beating, molesting, or wounding EM; stalking EM by sending mail or other communications to her or contacting EM by phone; threatening to kill or physically injure EM; interfering with EM at her place of employment; interfering with EM at her place of education; and engaging in conduct that impairs EM's educational relationship or environment. The PPO was set to expire on January 5, 2023. On July 8, 2022, EM moved to modify the PPO, asking the trial court to also prohibit BD from following EM, appearing at her workplace or residence, and approaching or confronting EM in a public place or on private property. A hearing on the motion was scheduled for July 22, 2022. The hearing was subsequently rescheduled for August 5, 2022. But according to the register of actions, the hearing was canceled for reasons unknown. The motion was never heard, addressed, or resolved.

On December 20, 2022, EM, again through her next friend KM, moved to extend the PPO. In the motion, EM expressed that she felt more safe having the PPO, that BD had been expelled by the Mason School District, and that she once saw BD from a distance at a school football game, where he was not allowed to be.[5] EM elaborated that the parties' brothers were in the same grade and involved in sports, and she did not want to feel as if she could not attend her brother's events on the chance that BD may show up. EM also claimed that extending the PPO would alleviate her fears about participating in school activities and sporting events. By order dated December 20, 2022, the trial court granted the motion and extended the PPO to January 1, 2024, finding that circumstances continued to exist that required an extension of the PPO. An ex parte PPO was simultaneously entered, prohibiting BD from engaging in conduct listed in the previous PPO. The trial court indicated in the PPO that BD continued to pose a credible threat to EM's physical safety.

---

[4] The record is not revelatory regarding the specific reasons for the recusal.

[5] There is no dispute by the parties that a determination was made that a Title IX violation occurred, that the school district expelled BD for the 2022-2023 school year given the Title IX violation, and that no criminal charges were pursued by an outside prosecutor's office after the local county prosecutor recused his office because BD's father was a local detective. Although the lower court record does not contain any supporting documentation, BD himself acknowledges in his brief on appeal that following the Title IX investigation, "[s]chool administrators concluded that, by a preponderance of the evidence, the allegations were proven[.]"

On December 29, 2022, BD filed an objection to the extension of the PPO and moved for an order terminating the PPO.[6]  BD asserted that he had been expelled from EM's school, that he had not attended any activities sponsored by the Mason School District, and that he had not been on any property owned by the school district.  BD further contended that the parties had nothing in common that would cause them to be in the same location, that there was no allegation that the PPO had been violated, that no criminal charges were ever filed against BD, and that there was no reason to believe that there would even be incidental contact between the parties.  In his supporting brief, BD noted that the parties had never been in an actual dating relationship.  BD argued that PPOs are not designed to be perpetual, and he asked the court to reject EM's stance that an extension was needed to make her feel "more safe."  BD maintained that he had done nothing to intimidate or harass EM, nor had he directly or indirectly contacted EM.

A hearing on BD's objection to and motion to terminate the PPO was not held until April 14, 2023.  At the hearing, BD's counsel acknowledged that BD planned to seek reenrollment in the Mason School District at the conclusion of his expulsion that covered the 2022-2023 school year.  EM also intended to remain in the school district; she was now a freshman at Mason High School.  BD's attorney noted that if BD was permitted to reenroll such that he and EM would both be going to Mason High School, the school district would put in place no-contact requirements in relation to the reinstatement, which would be sufficient to keep EM safe, so there was no need to continue the PPO.

EM took the stand and was questioned solely by the trial court.  EM testified that on one occasion after the PPO was issued she saw BD in the Mason Middle School.  EM elaborated as follows: "I was walking out of my class and he was by his locker and he just kept looking at me and the person I was walking with."  The incident lasted a few seconds and left EM nervous and upset.  BD did not say anything to EM, but neither did he walk away.  Instead, EM lost sight of BD only after she walked away and went to her locker in a different hallway.

BD's counsel then called BD's father to testify.  The father testified that BD was currently taking online classes through Graduation Alliance and had a 3.5 grade point average.  BD's father indicated that the family took steps to make sure that BD did not violate the PPO.  He further testified that BD's expulsion from school prevented BD "from being on any of the school property."  The father stated that there was a family plan that, should BD inadvertently see EM, BD was to leave the location and call his parents.  He additionally testified that he and his wife monitored BD's cellphone to make sure contact was not taking place, which they would continue to do even if the PPO were terminated.  On cross-examination, BD's father, while noting that BD could not be on school property even if the PPO was terminated, conceded that without the PPO in place, there would be nothing illegal were BD to contact EM.

The parties presented their arguments for and against continuing the PPO, and the trial court, ruling from the bench, denied BD's request to terminate the PPO.  The trial court reasoned that if BD reenrolled in the school district, there was reasonable cause to believe that "another event could occur in the future."  The court explained that EM was "under no requirement to rely

---

[6] BD proceeded by and through his next friend, his mother.

simply on the school to protect her." On April 14, 2023, the trial court entered an order denying BD's motion to terminate the PPO. With this ruling, the PPO was scheduled to remain in effect until January 1, 2024.

On December 21, 2023, EM, through her next friend KM, moved to once again extend the PPO. In support of the motion, EM claimed that the Mason School District had allowed BD to reenroll, that he was now at Mason High School absent a district plan for EM's safety, and that EM felt unsafe and worried about encountering BD. EM asserted that the school district's decision to allow BD to return without any restrictions "negatively affected her educational experience." In support of this contention, the motion stated as follows:

> This includes [BM] walking by [EM] daily, his occasionally being present at the same lunch, and, in one instance, his coming into one of her classrooms even though he was not in the class. At times he seems to make a point of looking at her and once tried to make eye contact, which makes [EM] stressed and anxious. It is upsetting to [EM] that she must deal with the situation regularly now that he is back in the same school.

On December 22, 2023, the trial court granted EM's motion and extended the PPO until January 5, 2025. The court found that circumstances continued to exist that required extension of the PPO. On the same date, an ex parte PPO was entered by the trial court that mimicked the previous PPOs, and it contained the same prohibitions, including barring BD from interfering with EM at her place of education and from engaging in conduct that would impair her educational relationship or environment.

On January 3, 2024, BD once again objected to the extension of the PPO and asked the court to terminate the PPO. Through counsel, BD denied that the high school had no plan for EM's safety, and he further denied that he violated the PPO as claimed by EM. BD contended that there was an investigation regarding the alleged PPO violation and that video surveillance revealed that there was no violation. BD further maintained that the school had a safety strategy in place pursuant to which BD was to have no contact with EM. According to BD, video footage showed that BD never made contact with EM inside the school.[7] BD stressed that he had no interest in making contact with EM and that his educational development was being restricted and cabined by EM's holding the PPO over him. BD asserted that school officials had offered to add a provision to the safety plan that would have required the parties to take different routes to and from classes; however, EM rejected the plan. On January 18, 2024, BD submitted a supplemental objection that attached a "No Contact Order" (NCO) that BD "believed to be the Safety Plan." The NCO had names blacked out and was unsigned. The NCO provided that it "applies to direct and indirect contact at school, on school grounds, or at school-sponsored events, including, but not limited to, physical, verbal, written, and electronic contact, between the above named individuals." Under the NCO, "direct contact" included "[f]ace-to-face contact."

---

[7] The record does not indicate that any video materials were ever submitted to the trial court.

A hearing on BD's objection and motion to terminate the PPO was held on January 19, 2024. EM was the sole witness at the hearing, and she testified that while BD did not say or do anything to her, she saw him in school at least two times a week, which reminded her of the prior sexual assaults, resulting in "really bad anxiety" and migraines that interfered with her education. EM explained that she had rejected the plan proposed by the high school about taking varied routes to classes because she was the victim and should not be expected to change how she experienced her high school life. This concluded EM's testimony, and the parties and the trial court then turned their attention to the NCO. EM's counsel argued that the NCO was being violated with respect to the face-to-face provision because EM was seeing BD at least twice per week in the high school.[8] BD's attorney did not believe that the NCO was violated simply because EM would at times see BD in the hallways.

The trial court next focused on the PPO and the language prohibiting BD from interfering with EM's place of education and impairing her educational relationship or environment. The trial court denied the motion to terminate the PPO, effectively concluding that BD's presence in the high school, which resulted in EM seeing BD on a regular basis in the school, impaired EM's educational environment because she suffered severe anxiety and migraines upon and after seeing BD. The court believed that the NCO was not really being followed because face-to-face contact was regularly occurring. The trial court noted that "they're gonna have face-to-face contact if they attend the same school[;] [s]o, she gets to go to school there and he probably should make other arrangements." The trial court reiterated that BD's attendance at the high school interfered with and impaired EM's educational relationship or environment. The court agreed with EM's attorney that the PPO should be kept in place as long as BD continued attending Mason High School, and the court noted that EM seeing BD at school might be a violation of the PPO, which issue was not currently before the court. The trial court elaborated:

> The reason why I have to extend the order is because [BD] decided to go back to her school. That's it. He's done nothing else than just exist at that school where she is. . . . I know everyone wants to go to their local school, but there [are] choices. And so, if he were to go to a different school . . . I wouldn't see a need for the order to be in place because he hasn't done anything else untoward other than appear at the school . . . .

---

[8] EM did testify that the parties did not have any classes together. EM's attorney accepted the fact that the NCO was in place, but he believed that it was essentially worthless.

On January 19, 2024, the trial court entered an order denying BD's motion to terminate the PPO, finding that circumstances continued to exist that required continuation of the PPO.[9]  This appeal ensued.[10]

## II.  ANALYSIS

## A.  APPELLATE ARGUMENTS

BD argues that the trial court erred by concluding that simply attending school can be the equivalent of engaging in conduct that impairs another student's educational relationship or environment.  And he maintains that he did not engage in any conduct that impaired EM's educational relationship or environment.  BD contends that he has to pursue an education and that the state has an obligation to educate him.  More detailed aspects of BD's arguments are set forth and addressed below.

EM argues that the trial court was correct in extending the PPO because there existed reasonable cause to conclude that BD interfered with and impaired EM's educational environment.  EM asserts that allowing BD to continue going to the same school as EM would be comparable to placing a victim in the same jail cell as her perpetrator.  EM posits that BD's argument that the state has an obligation to educate him is irrelevant to the issues on appeal.

## B.  STANDARDS OF REVIEW

In *TT v KL*, 334 Mich App 413, 438; 965 NW2d 101 (2020), this Court set forth the review standards applicable to PPO rulings, stating:

> We review for an abuse of discretion a trial court's decision regarding whether to issue a PPO. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. A court necessarily abuses its discretion when it makes an error of law. Factual findings underlying a PPO ruling are reviewed for clear error.  [Citations omitted.]

"The clear-error standard requires us to give deference to the lower court and find clear error only if we are nevertheless left with the definite and firm conviction that a mistake has been made." *PF v JF*, 336 Mich App 118, 126; 969 NW2d 805 (2021) (quotation marks and citation omitted).

---

[9] We note that in BD's brief on appeal, he asserts that on January 27, 2024, EM's family filed a federal lawsuit against the Mason School District, two high school administrators, and BD's parents in relation to the events that gave rise to the PPOs.

[10] On July 3, 2024, BD moved in this Court to expand the record so as to include a transcript of a hearing that was conducted on June 27, 2024.  This panel denied the motion.  *EM v BD*, unpublished order of the Court of Appeals, entered July 8, 2024 (Docket No. 369654).

## C.  PERTINENT PPO COURT RULES AND STATUTORY PROVISIONS

Except as otherwise provided in MCL 600.2950 and MCL 600.2950a, an action for a PPO is governed by the Michigan Court Rules.  MCR 3.701(A).  "Procedure for the issuance, dismissal, modification, or rescission of *minor* personal protection orders is governed by subchapter 3.700." MCR 3.981 (emphasis added).  "The court must rule on a request for an ex parte [PPO] within 24 hours of the filing of the petition."  MCR 3.705(A)(1).  "The petitioner bears the burden of establishing reasonable cause for issuance of a PPO, and of establishing a justification for the continuance of a PPO at a hearing on [a] respondent's motion to terminate the PPO[.]"  *Hayford v Hayford*, 279 Mich App 324, 326; 760 NW2d 503 (2008) (citations omitted).  A respondent may file a motion to terminate or rescind a PPO, MCR 3.707(A)(1)(b), in which case the "court must schedule and hold a hearing on [the] motion to . . . terminate [the PPO] within 14 days of the filing of the motion," MCR 3.707(A)(2).  See also MCL 600.2950a(13) and (14); *Patterson v Beverwyk*, 320 Mich App 670; 922 NW2d 904 (2017).  "A minor [PPO] is enforceable under MCL 600.2950(22), (25), 600.2950a(22), (25), 764.15b, and 600.1701 *et seq*."  MCR 3.982(A).

"MCL 600.2950 concerns PPOs involving current or former spouses, individuals in dating relationships, and housemates, while MCL 600.2950a, the nondomestic PPO statute pertinent here, addresses stalking behavior or conduct that is not limited to certain existing relationships."  *TT*, 334 Mich App at 439.  The circumstances of the instant case implicate MCL 600.2950a, and specifically MCL 600.2950a(2)(b), which provides, in relevant part:

> [A]n individual may petition the family division of circuit court to enter a [PPO] to restrain or enjoin an individual from engaging in . . . [o]ne or more of the acts listed in subsection (3), if the petitioner has been subjected to, threatened with, or placed in reasonable apprehension of sexual assault[11] by the individual to be enjoined. A court shall not grant relief under this subdivision unless the petition alleges facts that demonstrate that the respondent has perpetrated or threatened sexual assault against the petitioner. . . . Relief may be sought and granted under this subdivision regardless of whether the individual to be restrained or enjoined has been charged with or convicted of sexual assault . . . . [12]

---

[11] "Sexual assault" is statutorily defined as meaning "an act, attempted act, or conspiracy to engage in an act of criminal conduct as defined in section 520b, 520c, 520d, 520e, or 520g of the Michigan penal code, 1931 PA 328, MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g, or an offense under a law of the United States, another state, or a foreign country or tribal or military law that is substantially similar to an offense listed in this subdivision."  MCL 600.2950a(31)(f). BD does not contest that EM's allegations constituted "sexual assault" for purposes of MCL 600.2950a(2)(b).

[12] MCL 600.2950a(2)(b) is subject to any exceptions in MCL 600.2950a(28), which provides that "[i]f the respondent is less than 18 years old, issuance of a [PPO] under this section is subject to chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.1 to 712A.32."  The parties and the trial court never cited any Probate Code provision.  We do note that MCL 712A.2(h)

"The court may restrain or enjoin an individual against whom a protection order is sought under subsection (2) from . . . [i]nterfering with the petitioner at the petitioner's place of employment or education or engaging in conduct that impairs the petitioner's employment or educational relationship or environment." MCL 600.2950a(3)(e). Although not expressly implicated in this case, we note that "[i]f the petitioner is a minor who is enrolled in a public or nonpublic school that operates any of grades K to 12," the circuit court may prohibit an individual from "attending school in the same building as the petitioner." MCL 600.2950a(3)(k).

## D. DISCUSSION AND RESOLUTION

We conclude that the trial court did not abuse its discretion by extending the PPO. The trial court determined that there was reasonable cause to continue the PPO as long as BD insisted on attending the same high school as EM. The trial court reasoned that because of the severe anxiety and migraines suffered by EM upon seeing BD, his mere presence at the high school constituted conduct impairing EM's educational environment when the evidence demonstrated that she and BD regularly crossed paths. We find no clear error in the trial court's factual findings, nor did error occur with respect to the court's reasoning and legal analysis. The trial court properly operated on the premise that BD had sexually assaulted EM in class by way of digital-vaginal penetration when she was 13 years old.[13] Under those circumstances, it is quite understandable that EM would suffer severe anxiety upon seeing BD. Indeed, there was no evidence contradicting or undermining EM's claims regarding the effect that BD had on her when she saw him, even from a distance. Observing BD triggered EM's memories of the sexual assaults. Attempting to navigate classes and focus on learning could certainly and logically be impaired by EM's state of upset and migraines, especially considering that she never quite knew exactly when she might see or run into BD in the school. And EM testified that the bad anxiety and migraines that resulted upon catching a glimpse of BD interfered with her education.

Moreover, the trial court's stance was, *in effect*, that BD could not be permitted to attend the same high school as EM in light of the evidence that he had previously sexually assaulted her. And as indicated earlier, MCL 600.2950a(3)(k) expressly provided the trial court with the authority to prohibit BD from attending the same school as EM because she had been subjected to sexual assault by BD, regardless of the fact that he was not criminally prosecuted. See MCL 600.2950a(2)(b). We also note that acts impairing a petitioner's educational environment are not necessarily a basis for issuing a PPO under MCL 600.2950a(2)(b); rather, the circuit court is authorized to prohibit a respondent from impairing a petitioner's educational environment in the

---

provides that the family division of the circuit court has "[j]urisdiction over a proceeding under section 2950 or 2950a of the revised judicature act of 1961, 1961 PA 236, MCL 600.2950 and 600.2950a, in which a minor less than 18 years of age is the respondent[.]" "A [PPO] must not be issued against a respondent who is a minor less than 10 years of age." MCL 712A.2(h).

[13] To be clear, BD does not concede that he ever committed a sexual assault; however, solely for purposes of his analysis and argument regarding whether the trial court erred by extending the PPO, he does not assert that error occurred on the basis that no sexual assault took place.

-10-

future, MCL 600.2950a(3)(e), with a sexual assault serving as the underlying basis for issuing or extending the PPO.

BD argues that the effect on EM stemming from her "observation of BD is not BD's fault." BD makes this claim on the basis that he "had no option but to re-enroll in this school [Mason High School] under the law because he was required to petition to this particular school district." We conclude that BD's argument lacks merit. MCL 380.1311, which is part of Article 2 of the Revised School Code (RSC), MCL 380.1 *et seq.*, provides, in pertinent part:

> (2) [I]f a pupil . . . commits criminal sexual conduct in a school building or on school grounds, . . . the school board . . . shall expel the pupil from the school district permanently, subject to possible reinstatement under subsection (6).[14]
>
> * * *
>
> (6) The parent or legal guardian of an individual expelled under subsection (2) . . . *may petition* the expelling school board for reinstatement of the individual to public education in the school district. If the expelling school board denies a petition for reinstatement, the parent or legal guardian . . . may petition another school board for reinstatement of the individual in that other school district. . . . [Emphasis added.[15]]

The language suggests that any attempt at reinstatement or reenrollment had to first be made by BD's parents to the Mason School District and then denied before reinstatement could be

---

[14] We note that the PPO statute uses the term "sexual assault" and not "criminal sexual conduct." See MCL 600.2950a(2)(b). "Criminal sexual conduct" is statutorily defined in the RSC as a "violation of section 520b, 520c, 520d, 520e, or 520g of the Michigan penal code, 1931 PA 328, MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g." MCL 380.1311(12)(b). There is no reference in the definition to a criminal conviction or juvenile adjudication. We further note that MCL 380.1311(2), aside from mandating expulsion of a student who commits criminal sexual conduct in a school building or on school grounds, mandates expulsion of a pupil who "pleads to, is convicted of, or is adjudicated for criminal sexual conduct against another pupil enrolled in the same school district[.]" It therefore appears that a pupil is subject to mandatory expulsion for committing an act of criminal sexual conduct in a school building or on school grounds even though a criminal conviction or juvenile adjudication does not result.

[15] "For an individual who was in grade 6 or above at the time of expulsion, the parent or legal guardian or, if the individual is at least age 18 or is an emancipated minor, the individual may initiate a petition for reinstatement at any time after the expiration of 150 school days after the date of expulsion." MCL 380.1311(6)(a). "[A]n individual expelled under subsection (2) is expelled from all public schools in this state and the officials of a school district shall not allow the individual to enroll in the school district unless the individual has been reinstated under subsection (6)." MCL 380.1311(4).

sought in a different school district. But BD ignores the educational alternatives, which are touched on in part in MCL 380.1311(4):

> Except as otherwise provided by law, a program operated for individuals expelled under subsection (2) shall ensure that those individuals are physically separated at all times during the school day from the general pupil population. If an individual expelled from a school district under subsection (2) is not placed in an alternative education program, strict discipline academy, or cyber school, the school district may provide, or may arrange for the intermediate school district to provide, appropriate instructional services to the individual at home.

There are clearly options available to an expelled student such that he or she can still obtain an education without returning to the classroom or school from which the student was expelled.[16] Moreover, contrary to BD's position, there is no legal obligation under MCL 380.1311(6) ("may petition") for the parent or guardian of an expelled student to petition for the student's reinstatement. Further, with respect to the period after the school district reinstated BD for the 2023-2024 school year and he began attending classes, we read nothing in the plain language of MCL 380.1311 that would bar his enrollment in a different school district. Accordingly, BD's argument that his observation of EM was not his fault because he was required to go to Mason High School or because his parents were forced to seek reinstatement within the district is inherently flawed.

Additionally, BD could not escape the reach of the PPO even assuming he otherwise had a right to be reinstated at and attend Mason High School. Again, MCL 600.2950a(3)(k) allows a court to enter a PPO prohibiting a respondent who committed a sexual assault from "attending school in the same building as the petitioner." Therefore, the Legislature contemplated scenarios in which it would be necessary for a court to issue a PPO that prohibited a minor student from attending school for the protection of another student. Just like a minor student adjudicated guilty after a trial or who enters a plea of admission in a juvenile delinquency proceeding and thereafter cannot attend a typical school after placement in a juvenile institution, a PPO respondent may not be able to attend school under the prohibitions in the PPO. A juvenile delinquent or PPO respondent will not be able to attend school by simply claiming the general right as a minor to attend school.[17]

---

[16] We note that BD acknowledges that he participated in alternative education for the 2022-2023 school year (year of expulsion), and his father so testified as indicated earlier.

[17] For these same reasons, we reject BD's argument under MCL 380.1561(1) that the PPO extension was improper because Michigan law required BD's parents to make sure that he attained a high school diploma. MCL 380.1561(1) provides, in part:

> Except as otherwise provided in this section, for a child who turns age 11 on or after December 1, 2009 or a child who was age 11 before that date and enters grade 6 in 2009 or later, the child's parent, guardian, or other person in this state

BD complains that he was given certain rules and guidelines to follow, i.e., the school district's safety plan and NCO, but then the rules were changed in the middle of the school year, which had a "deleterious impact on *his* educational relationship and environment." We find this argument misplaced. BD can point to no requirement that those two sets of rules were required to be consistent. The origins of the "rules" were two different sources—the school district and the trial court that issued the PPO. The trial court was not bound or otherwise restricted by the school district's plan. Furthermore, BD's adamant protestations regarding his own educational relationship or environment must be treated as secondary and give way to those held by the actual victim in the case, not the perpetrator. BD cannot legitimately complain about what he is missing out on as a high school student when it was his conduct that caused the PPO to be issued in the first place. We recognize that BD wants to put his inappropriate actions behind him and move on with his life, but we cannot lose sight of EM's ongoing emotional struggles going forward.

BD further appears to argue that the school district's imposition of the safety plan or NCO sufficed to safeguard EM such that the PPO became unnecessary and improper. But the trial court concluded on the basis of EM's uncontradicted testimony that she regularly saw BD at school that the safety plan or NCO did not adequately shield EM, thereby making it imperative to extend the PPO. We cannot conclude that this factual finding was clearly erroneous. Moreover, BD fails to cite any authority that would have precluded the trial court as a matter of law from going further than the safety plan or NCO when extending the PPO.

BD additionally argues that there was no testimony that he did anything when in view of EM; he did not stare, wave, yell, or point at EM.[18] In other words, according to BD, he did not engage in any "conduct" as necessary to justify the continuation of the PPO. BD's argument fails to give weight to the impact that seeing him at school had on EM. In fact, PPOs are generally designed to prohibit a respondent from appearing in a petitioner's presence regardless of whether the respondent engages in any particular conduct when in the petitioner's view. See MCL 600.2950a(f)-(h) (authorizing a court to enjoin a person from, in part and respectively, "[f]ollowing or appearing within the sight of the petitioner," "[a]pproaching or confronting the petitioner in a public place or on private property," or "[a]ppearing at the petitioner's workplace or residence"). Furthermore, the affirmative act of BD attending the high school, in and of itself, constituted conduct. Accordingly, we reject BD's argument.

In his reply brief, BD argues that EM's testimony was insufficient to demonstrate that the alleged anxiety from seeing BD caused her migraines, that the migraines occurred on days that she saw BD, and that the migraines had an impact on her education. At the motion hearing on January 19, 2024, when the trial court queried EM regarding how seeing BD interfered with her education, she replied: "Because when I see him it gives me really bad anxiety and my anxiety causes

---

having control and charge of the child shall send the child to a public school during the entire school year from the age of 6 to the child's eighteenth birthday.

[18] We note that, as indicated earlier, EM testified at the first evidentiary hearing on April 14, 2023, that she saw BD by his locker on one occasion after the PPO was issued and that "he just kept looking at [her]."

migraines. I'm diagnosed with chronic migraines." When asked by the court whether she suffered any migraines on school days during the past six months, EM responded: "Yes, multiple." EM further testified that she was seeing a neurologist and a therapist. We conclude that this testimony and the reasonable inferences arising from the evidence supported the trial court's finding that EM suffered severe anxiety and migraines after seeing BD that impaired her educational environment.

## III. CONCLUSION

The trial court did not err by extending or continuing the PPO in favor of EM in light of the fact that BD insisted on attending the same high school as EM. This ruling was supported by evidence that EM regularly observed BD at school and suffered severe anxiety and migraines upon seeing him given that he had previously sexually assaulted her, which she relived when she saw BD.

We affirm. Having fully prevailed on appeal, EM may tax costs under MCR 7.219.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Michael J. Riordan